JOHN S. HICKS, Appellant, *v.* NEWCOMB CLEVELAND, Respondent.

A. verbal agreement for the sale of property void by the statute of frauds cannot be ratified by an assignment by the vendor of an account against the vendee therefor. The sale can only be rendered valid by the concurrence of both the vendor and the vendee in some one of the things required by the statute to give it validity.

B. gave to G. a verbal order for a bill of furniture to be shipped to B. at Milwaukie; prior to its arrival B. left Milwaukie, leaving word that the furniture be returned to G. Upon the arrival of the furniture at Milwaukie it was seized by the sheriff as the property of B. by virtue of a writ of attachment against him. While in the possession of the sheriff G. assigned his interest therein to plaintiff. After the assignment judgment was perfected in the action, wherein the attachment was issued and execution issued thereon. By virtue thereof the sheriff levied upon and sold the property under the directions of defendant, the judgment creditor. No demand for the goods was made by plaintiff.

*Held,* that the seizure of the property, by virtue of the attachment, did not change the title; it remained in G., and was transferred to plaintiff. Every fresh interference therewith was a new wrong, and the seizure and sale thereof by virtue of the execution was a conversion, for which plaintiff could recover.

(Argued May 18th, 1871; decided September term, 1871.)

APPEAL from judgment of the General Term of the Supreme Court in the first judicial district, affirming judgment entered upon verdict in favor of defendant.

This is an action of trover, and is brought by the plaintiff

against defendant for a wrongful conversion of personal property of the value of $1,500.

The complaint sets up that at Milwaukie, in the State of Wisconsin, defendant wrongfully converted and disposed of the personal property of the plaintiff, consisting of household furniture of the value of $1,500, in the early part of January, 1855, or about that time, and claimed damages in the sum of $1,500 and interest thereon from the alleged date of conversion, and costs.

The answer, first, denies each and every allegation of the complaint; and, second, alleges that the property in question was not the property of the plaintiff, but of one Levi Blossom, against whom the above defendant, Newcomb Cleveland, on the 5th day of April, 1855, had recovered judgment in the County Court of Milwaukie county, in the State of Wisconsin, for the sum of $3,205.25; that on the 7th day of May, 1855, an execution was issued on said judgment against the goods and chattels of said Levi Blossom to the sheriff of said Milwaukie county; and that in virtue thereof said sheriff took the goods in the complaint named as the property of said Blossom and sold and converted the same under and by virtue of said execution, as he lawfully might, which was the conversion of plaintiff's property complained of, and no other.

The action was tried at the circuit in the city of New York in February, 1865, before a justice of the Supreme Court and a jury, and the following facts appeared:

In 1854 one William C. Gardner resided in New York city and carried on the business of a cabinet-maker and furniture dealer in said city, and in July or August of that year one Levi Blosson, who then resided in Milwaukie, ordered a bill of furniture from him, the property described in the complaint. The order was a verbal one. The goods were to be sent to Blossom, at Milwaukie, to the care of Thomas P. Williams. Blossom was to give his acceptances for the amount of the bill on delivery of the goods at Milwaukie, payable in six months. The goods were sent according to directions about the 20th of October, 1854, and went to

Milwaukie by the lakes and canals. In October, 1854, Gardner drew two drafts on Blossom for the amount of the bills and forwarded them to Milwaukie for Blossom's acceptance. They bore date, respectively, 9th and 30th October, 1854— were for $514.25 each, and each payable six months after date. The two drafts were returned to Gardner a few days after he sent them forward for acceptance, unaccepted. Blossom did not receive the property. He left Wisconsin for the State of California before the goods arrived, and did not return there again in some year and a half or two years. Before leaving Wisconsin, Blossom directed one Watkins to inform Mr. Gardner that he would not receive the property, and return the same to Gardner if it should arrive. Blossom never gave any bill or acceptance for the goods. About the 27th day of November, 1854, Gardner learned that Blossom had left for California, and immediately wrote a letter to one C. K. Watkins, and sent it to him, authorizing Watkins to take possession of all of the several boxes of furniture in store at Milwaukie, marked Levi Blossom, in his, Gardner's name, and hold them as his property until further orders.

On the 24th day of November, 1854, a writ of attachment against the property of said Blossom, directed to the sheriff of Milwaukie county, was issued out of the County Court of Milwaukie county, in an action therein pending wherein Newcomb Cleveland was plaintiff, and said Blossom was defendant, commanding him to attach so much of the property of said Blossom in his county as might be necessary to satisfy the demand in suit. In executing this writ, Herman L. Page, the then sheriff of Milwaukie county, on the 24th day of November, 1854, seized and attached as Blossom's property the furniture in question, Cleveland having first given said sheriff a bond of indemnity.

On the 18th day of January, 1855, Gardner executed to the plaintiff in this action an instrument, of which the following is a copy : " This is to certify that I have, this eighteenth day of January, 1855, for and in consideration of one hundred dollars, assigned, sold and delivered into the

hands of John S. Hicks, of the city and county of New York, my account against Levi Blossom, formerly of the city of Milwaukie, for the purchase of a large bill of cabinet furniture, amounting to $1,028.50, which lot of furniture has been seized by the sheriff of that county for the debts of the said Levi Blossom, and sold for the benefit of certain of his creditors. It is further understood and agreed that the said Hicks is to assume the responsibility and expense of suit for the collection, if possible, of said claim, and appropriate the proceeds, if any, to his use and benefit.

"WILLIAM C. GARDNER." [L.S.]

On the 5th day of April, 1855, judgment final, in favor of Cleveland against Blossom, in the action, in which the attachment was issued, was entered, for $3,205.25, damages and costs.

May 7th, 1855, a *fi. fa.* was issued on said judgment to the sheriff of Milwaukie county, commanding him to take the goods of Levi Blossom to satisfy said judgment.

June 2d, 1855, Samuel S. Conover, the then sheriff of Milwaukie county, sold the property in question under the *fi. fa.* He had, after the execution came into his hands, levied upon it, by order of Cleveland, as the property of Blossom, under the writ, and suspended the sale until Cleveland had given him a bond of indemnity.

June 13th, 1855, Cleveland receipted to Conover for $472.41, on account of the execution.

The evidence showed $633.50 to be a fair market value of the property at Milwaukie, at the time of conversion.

About two years after these goods were attached, and a short time before the commencement of this suit, which was in February, 1857, Mr. Gardner, at the suggestion of the plaintiff and his attorney, interlined in the assignment of January 18, 1855, after the figures "$1,028.50," the following words: "and said furniture itself." The following is the evidence of Mr. Gardner, and all the evidence in the case as to this interlineation: "The words, 'and said furniture

itself,' were interlined at the suggestion of Mr. Hicks and the attorney; it was done with the three together, by consent, about two years after the goods were taken; I supposed I had written the assignment correctly, but, not being a lawyer, I learned that I did not cover the ground.

" Q. Will you explain what was the original agreement; what was talked over between you and Mr. Hicks at the time you made the assignment of January 18, 1855? A. It was agreed that Mr. Hicks should prosecute — follow the furniture; and when I drew this I supposed I covered all that ground.

" Q. What was the agreement? A. That he should follow this furniture, prosecute, and recover, if possible to do so.

" Q. What was said? A. The bargain was that he should get the furniture, and I made the assignment to him in the expectation that he would push the matter; get the furniture seized and go on and recover it.

" Q. Was there anything said between you and Hicks at the time about the furniture being in Milwaukie, or as to where it was? A. Yes, sir; I said it was in Milwaukie; that it had been seized, and that the agreement was that he should recover it, if in any legal way possible to do so.

" Q. Tell what was said between you and Hicks? A. We talked the matter over.

" Q. What was said? A. Something like this: that he was to get the property or its value.

" Q. What were you to do? A. I was to assign it to him and I drew up the assignment; that was an agreement that he should prosecute and recover the value of the property.

" Q. Was there anything said between you and him as to whether the sheriff had taken the property? A. Certainly; we both knew that the property had been seized by the sheriff.

" Q. Have you anything more to say in regard to the transaction between you and him? A. The agreement was that I should assign the goods to him, and the claim, and that he

should prosecute and recover at his own expense and for his own benefit; this is as near as I can recollect.

" Q. Did you speak to Hicks in reference to this matter, or he to you? A. I spoke to him.

" Q. What did you tell him? A. I told him I wanted him to prosecute the matter, and I would assign the property to him for a consideration, and I did so for $100; that, however, was merely nominal; he paid me more than that; I drew the assignment in accordance with the agreement."

On the cross-examination of the witness by defendant's counsel, the witness said:

" Q. What claim did you assign? A. The claim against Blossom; that is the way the assignment reads, I suppose; the words, 'and the furniture itself,' were interlined, I think, some time in 1857, before the commencement of the suit; it might have been a short time before."

No demand was made by plaintiff of defendant for the goods before the commencement of this action.

At the close of the evidence the court held that plaintiff was not entitled to recover, and directed the jury to find a verdict for the defendant, and the plaintiff excepted to the ruling of the court, and the jury found a verdict for the defendant.

From the judgment entered upon this verdict the plaintiff appealed to the General Term of the first district, and from judgment of affirmance there to this court.

*Alexander Spaulding* for appellant. The contract could be reformed by consent, and such reformation would vest title in plaintiff, as of the date of the original instrument. (*Gillespie* v. *Moore*, 2 John. Ch. R., 585; Story's Eq. Jurisp., § 161.) It is the duty of the court to so construe the assignment as to give force and effect to the instrument. (Story on Con., § 660; 17 N. Y., 468; *McKee* v. *Judd*, 2 Kern., 626.) Any unlawful interference with property after assignment gave plaintiff right of action without demand. (*N. Y. Car Oil Co.* v. *Richmond*, 6 Bosw., 213; 5 Cow. & Hill's Notes,

224.) A sheriff acts at his peril in levying. (*Kulkman* v. *Orser*, 2 Duer, 242.) The sale put it out of defendant's power to comply with demand. None, therefore, was necessary. (*Everitt* v. *Coffin*, 6 Wend., 668; *La Place* v. *Auprix*, 1 John., 406, and cases cited; *Cortelyeou* v. *Lansing*, 2 Caine's Cases, 213; *Davidson* v. *Donadi*, 2 E. D. Smith, 121; *Vincent* v. *Conklin*, 1 E. D. Smith, 203; *Glassner* v. *Wheaton*, 2 E. D. Smith, 352; *Esmay* v. *Fanning*, 5 How., 228; *Sharp* v. *Whipple*, 1 Bosw., 557.)

*Henry E. Knox* for respondent. If the words added to assignment can be regarded as a conveyance of the property in order to perfect right, it was necessary to make demand. (*Hall* v. *Robertson*, 2 Comst., 293; *Sherman* v. *Elder*, 24 N. Y., 384; *Duell* v. *Cudlip*, 1 Hilt., 166; *Cass* v. *N. Y. and N. H. R. R. Co.*, 1 E. D. Smith, 522; *Hassell* v. *Borden*, 1 Hilt., 128.)

EARL, C. It is not claimed on the part of the respondent that any title to these goods was ever vested in Blossom. The sale was void by the statute of frauds. There was no delivery, acceptance, part payment or memorandum in writing. Hence the defendant was an undoubted wrong-doer in causing this property to be attached and sold as the property of Blossom. The cause was first tried in 1860, and the plaintiff had a verdict. The defendant appealed and a new trial was granted, Mr. Justice INGRAHAM writing the opinion, from which we extract the following: "The assignment transfers the bill for the prices of the goods and the goods themselves, but does not transfer any claim for damages, either for previous conversion of the goods, or for a trespass for taking them. Originally the assignment was only for the bill of the goods sold, made in January, 1855. The property was sold by the sheriff in June, 1855. The alteration of the paper, so as to include the sale of the goods, was two years after, or in 1857. It is clear the first assignment did not transfer this claim, but ratified the sale. The subsequent sale of the goods,

after the conversion and sale with knowledge, did not give a right of action for the previous trespass or conversion. If it was of any avail, it could only be so on a demand, after the conveyance of the goods was complete."

There was a second trial in 1862, and a verdict was taken for the plaintiff, subject to the opinion of the General Term; and the General Term in 1863 set aside the verdict and ordered a new trial substantially upon the same grounds as before.

It is important first to determine what the plaintiff really got by his purchase from Gardner. The assignment, as drawn, was clearly only of an account for the goods against Blossom. But Gardner had no account or claim against Blossom. The sale to him was entirely void. I am unable to see how making out and assigning this account ratified the previously void sale. The sale could in no legal sense be ratified; but it could be rendered valid only by a compliance with the statute of frauds, which could only be by the concurrence of both the vendor and the vendee in some one of those things required by the statute. Hence, the assignment, as originally drawn, did no harm, if it did no good.

It must be conceded that the interlineation, so far as this case is concerned, gave the plaintiff no new rights, and in no way bettered his position. He must stand or fall by what took place when the assignment was executed.

The plaintiff could purchase the property or a claim for damages for its conversion, without a writing. As it was of the value of more than fifty dollars, he was simply required to comply with the statute of frauds; and this he did by paying the whole or a part of the purchase-money. If, therefore, by mistake, as now claimed, the writing did not express the intention of the parties, and did not cover the property really sold, the plaintiff did not lose the property, but can show, by parol, precisely what it was that he bought. Before the commencement of this suit, the parties to the writing got together and made the interlineation, so as to conform it to their origi-

nal intention; so that it no longer, as evidence, in any sense, concluded even the parties to it, as originally drawn.

What, then, does the parol evidence show that the plaintiff actually bought of Gardner? Most clearly, the property. Gardner, by the sale, clearly meant to give him the right to pursue and recover the property, or its value. He says it was the agreement that he should assign the goods and the claim for the property to him. I think there would be but little difficulty, upon the evidence, in also holding that he assigned to the plaintiff his claim for damages for the conversion. (*McKee* v. *Judd*, 12 N. Y., 622; *Waldron* v. *Willand*, 17 id., 466; *Sherman* v. *Elder*, 24 id., 381; *Whitney* v. *Slauson*, 30 Barb., 276; *Hall* v. *Robinson*, 2 N. Y., 293.) But it is not necessary to go so far in this case. He purchased the property January 18, 1855, after it had been attached by Sheriff Page, who kept it in his possession until January 1, 1855, when he delivered it over to his successor in office, Sheriff Conover. For the conversion by Sheriff Page the plaintiff in this action could not recover, for the reason that that was before the sale of the property to him, and he never made any demand after the sale to him.

But this seizure of the property by virtue of the attachment did not change the title to the property. It still belonged to Gardner, and his sale of it conveyed the title to the plaintiff. After the plaintiff got the title, the defendant caused the property to be seized by virtue of the execution in his favor against Blossom, and sold; and this was a conversion of the property, of which this plaintiff had the right to complain. Every fresh interference with the property was a new wrong.

The defendant first caused the property to be attached by Sheriff Page; for this he became liable to Gardner, if he chose to prosecute him. He then caused the property to be seized upon the execution and sold; and this was a wrong to this plaintiff, for which he can prosecute him; and, hence, upon the plainest principles of law, and the plaintiff can recover.

And, for this last interference with the property, the defend-

ant is liable without a previous demand. He was a naked wrong-doer, without any color of right. I do not think that the property was so in the possession of Blossom that even the sheriff could have justified a seizure of it; but it is sufficient, as against this defendant, to show that he caused the property to be wrongfully seized and sold after the plaintiff had purchased it.

These views lead to the reversal of the judgment and a new trial.

All concur, except LEONARD, C., not sitting.

Judgment reversed and new trial granted; costs to abide event.